# HAWAIIAN COMMERCIAL AND SUGAR COMPANY
## v. KAHULUI RAILROAD COMPANY.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED MARCH 17, 1898.          DECIDED JULY 19, 1898.

FREAR AND WHITING, JJ., AND W. R. CASTLE, ESQ., OF THE BAR, IN PLACE OF JUDD, C.J., DISQUALIFIED.

An injunction may properly be issued to restrain the taking of property under an alleged but non-existing right of eminent domain.

Chapter 29, Laws of 1878, confers the right of eminent domain upon only such corporations as have entered into a contract with the Minister of the Interior for the purpose of building and operating a railroad, and not upon all corporations that have incorporated, under the general corporation law, for the purpose of building and operating a railroad.

Defendant's charter, the scope of which is set forth in the opinion, is not and does not contain a contract made under the authority of the Act of 1878 with the Minister of the Interior.

A release by Crown Land Commissioners of all claims for damages by reason of defendant's taking and using certain lands and a covenant by them not to interrupt or hinder defendant in such

taking and use, does not estop plaintiff, a subsequent grantee of the land, from seeking an injunction to restrain defendant from condemning and taking such land under an alleged but non-existing right of eminent domain.

OPINION OF THE COURT BY FREAR, J.

This is a bill in equity for an injunction to restrain the defendant, a domestic corporation doing business (principally in conducting a railway) on the island of Maui, with its wharf and main office at the seaport town of Kahului, from proceeding under an alleged right of eminent domain to condemn and take for the purposes of its railway certain land in said town of Kahului belonging to the plaintiff, a foreign corporation doing business (principally in conducting a sugar plantation) on said island of Maui. The relief is sought on the grounds that by taking said land the defendant would obtain exclusive access to the harbor of Kahului and thereby, as well as by depriving the plaintiff of the use of said land, cause the plaintiff irreparable injury, and that the defendant has no right of eminent domain. The defendant answered denying both these grounds and averring the contrary and also that it held the said land under certain deeds made with full authority by the Crown Land Commissioners prior to the conveyances from the Hawaiian Government under which the plaintiff claims. The Circuit Judge, after hearing evidence, found for the defendant on both grounds relied on by the plaintiff and dismissed the bill. The plaintiff now brings the case to this court on appeal.

As to the first ground, the Circuit Judge was fully supported by the evidence in finding that the frontage on the harbor available for wharf purposes which the defendant proposed to take was only a little more than one-third of the whole frontage available for such purposes, and consequently that the defendant would not by taking the land in question obtain, as alleged, exclusive access to the harbor, but this point becomes unimportant in view of our conclusion that the decision of the Circuit Judge must be reversed on the other point. In our opinion the de-

fendant had no right of eminent domain, and by the weight of authority, as the defendant practically concedes in this case, an injunction may properly be granted to restrain the taking of property under an alleged but non-existing right of eminent domain.

Whether the defendant may exercise the right of eminent domain or not depends upon the constitutionality and construction of the Railway Act of 1878 and the construction of defendant's charter. If that Act is unconstitutional the defendant has not the right in question. This point of the constitutionality of the Act was raised for the first time in this court and was argued with great ability by Mr. Chas. S. Wheeler of the San Francisco Bar, by permission of the court and without objection from opposing counsel, but in view of our opinion upon the question of the construction of the Act it will be unnecessary to pass upon its constitutionality. Whether, so far as the construction of the Act is concerned, the defendant may exercise the right of eminent domain or not, depends upon whether that Act confers that right upon all domestic public railway corporations or only upon such as have a contract with the Minister of the Interior as provided for in the first section of the Act. It is conceded that the defendant has no such contract unless contained in its charter. Whether the charter contains such a contract will be considered later. In our opinion, only such corporations as have such a contract may exercise the right in question under this Act.

This Act is Chapter 29 of the Laws of 1878, entitled "An Act to Promote the Construction of Railways," and reads as follows:

"Section 1. Power and authority is hereby given to the Minister of the Interior, by and with the consent of His Majesty in Privy Council, to enter into contract with any association of persons who may associate themselves together under the General Corporation Act of this Kingdom, and by the general law in relation to corporations and subject to all the provisions thereof, for

the purpose of building and operating a railroad or railroads in any part of this Kingdom.

"Section 2. And the said Minister, with the consent of His Majesty in Privy Council, shall have power and authority to grant a right of way through all Government lands, and to grant such Government lands as may be necessary for their buildings, stations, depots, and stores, or other structures, and also the free use of water, to any corporation as aforesaid for the purpose of building such railroad or railroads.

"Section 3. For the purposes and subject to the provisions and restrictions of this Act, the corporation may, from time to time, exercise any of the following powers:

"It may enter upon any lands which may adjoin upon the line of any railway which may be authorized by charter to be made, and may bore, dig, cut, trench, embank and drain, and may remove or lay, take, carry away, and use any earth, gravel, stone, timber or other things dug or obtained therein or otherwise in the execution of any powers hereafter given and which may be proper for the making, maintaining, altering, repairing, or using any railway lawfully authorized, or which may obstruct the making, maintaining, altering, repairing or using of the same.

This section contains nine other paragraphs, each beginning with "It may" and enumerating the various powers conferred.

Section 4 provides for compensation; Section 5, the width of lands to be taken; Sections 6-10, taking lands for temporary use; Sections 11-18, methods of determining and enforcing compensation; Sections 19-22, disposition of lands acquired under the Act but not required for the purposes of the corporation, Section 19 reading as follows:

"Section 19. Where lands are acquired by the corporation under the provisions of this Act, but are not required for the purposes thereof, the corporation, within the prescribed period, or if no period be prescribed within ten years after the expiration of the time limited by the Charter for the completion of the

works, shall absolutely sell and dispose of all such superfluous lands and apply the purchase money arising from such sale to the purpose of the Charter, and in default thereof, all such superfluous lands remaining unsold at the expiration of such period, shall thereupon vest in and become the property of the owners of the lands adjoining thereto in proportion to the extent of their lands respectively adjoining the same."

Section 23 relates to fences; Sections 24-26 provide for the making and enforcing of by-laws and regulations.

"Section 27. And be it further enacted, that the said Minister is hereby authorized to guarantee to any corporation that shall undertake any such railroad or railroads, a profit of not less than five per cent. per annum on the cost of their road or roads and equipment thereof. Provided always, that in any contract which may be made, the extreme amount on which such guarantee is to be paid, shall be plainly set forth; and provided further, that when any such road shall have been finished, the actual cost of the road and its equipment shall be correctly made up and filed in the office of the Minister of the Interior; and provided further, that it shall be lawful for the Minister of the Interior, if it shall seem to him desirable, to refer the accounts of construction to two arbitrators mutually chosen, one by the said Minister, and one by such corporation or their agents, who shall choose a third, and the certificate of a majority of such referees, duly sworn to before some Justice of the Supreme Court, shall be taken to be the cost of the said road and its equipments." This section was amended in 1880 (Ch. 41) by substituting a subsidy of $2500 a mile for five per cent. profit.

"Section 28. And be it further enacted, that the Minister of Finance is hereby authorized and required to pay on the certificate of the Minister of the Interior, to the corporation or corporations in this Act contemplated, such sums of money as may be ascertained to be due by virtue and authority of the preceding section out of any moneys which may at the time be in the Public Treasury, not otherwise appropriated." Amended in 1880 to conform to the amendment of the preceding section.

"Section 29. And be it further enacted, that all the stock and shares in and all property of any corporation which may undertake the building of any railroad or railroads by the authority of this Act, shall be exempt from all public taxation until such time as the property, stock or shares of any such corpartion shall realize ten per cent. per annum on the amount invested." Repealed in 1880.

"Section 30. And be it further enacted, that any corporation which may be organized, and undertake the building of any railroad or railroads, in pursuance of the authority of this Act, and in accordance with it, may issue bonds to raise money for the construction of such railroad or railroads, in such sums as may be convenient."

"Section 31. And be it further enacted, that the aid by this Act contemplated, shall be only extended to railroads of public utility, and not to railroads of mere private or limited convenience."

As we shall have occasion to refer to portions of other Acts, they will be set forth here.

Sections 1, 2 and 6 of Chapter 62 of the Laws of 1888, entitled "An Act to Authorize and Promote the Construction of Steam Railroads on the Island of Oahu," are as follows:

"Section 1. Power and authority are hereby given to the Minister of the Interior, by and with the consent of the Cabinet, to contract with B. F. Dillingham, his associates and successors and their assigns, or such corporation as shall be formed and organized by him or them under the laws of this Kingdom, providing for the establishment of private corporations for the constructing and operating on the island of Oahu a steam railroad or railroads of not less than three feet gauge, for the carriage of passengers and freight:

"Provided, however, that if said Benjamin F. Dillingham, his associates and successors or their assigns, or such corporation shall fail, within eighteen months from the passage of this Act, to give satisfactory guarantees to the Government that he or

they are able to and will construct and put into operation within. three years from the approval of this Act, a steam railroad connecting Honolulu with Pearl River Lagoon, the said Minister may contract with any Hawaiian corporation for the construction and operation of any steam railroad in this Act authorized upon the terms and conditions herein expressed.

"Section 2.   The said Minister may, by such contract as aforesaid, confer upon Benjamin F. Dillingham, his associates and successors and their assigns, or any such corporation as shall be formed or organized by him or them as aforesaid (hereinafter referred to as such company) all such rights and privileges as to the acquisition of rights of way and other privileges for the construction, maintenance and operation of such roads, together with all depots, stations, yards, crossings, wharves and equipments as are set forth in an Act entitled "An Act to Promote the Construction of Railways," being Chapter XXIX. of the Laws of 1878, as amended by Chapter XLI. of the Laws of 1880, except as the same are modified by the provisions of this Act. Such contract shall secure to said company the exclusive right for twenty years from the date of this Act, to maintain and operate a steam railroad or railroads between such points as they shall, within three years from the passage of this Act, connect by such railroad, provided such railroad shall not be less than fifteen consecutive miles in length; and further provided that such exclusive right shall not apply to the District of Kona, in said Island of Oahu.

"Section 6.   Such company may enter upon, lease, purchase and hold any and all such lands, tenements, hereditaments and easements as shall be required for the construction, maintenance and operation of its road, after the location of such road has been approved by the Cabinet, but subject to the provisions hereinafter contained."

This Act of 1888 was amended in 1890 (Ch. 31) in respect to the time granted for the construction of the railroad, the length of the exclusive franchise, and the payment of a subsidy. This amendatory Act of 1890 contains the following:

"Section 5. Nothing herein contained shall be held to interfere with the right of said Oahu Railway and Land Company to exercise all of the rights, powers and privileges granted by said Chapter LXII. of the Laws of 1888, or by the general railway law of the Kingdom, except as to the exemption from taxes, provided however that nothing in this Act shall be deemed to authorize the Minister of the Interior to guarantee or pay any subsidy to said company under Sections 27 and 28 of the General Railway law of the Kingdom."

The question was raised in argument whether in construing the Act of 1878 the rule of strict construction or the rule of liberal construction should be applied. In our opinion the Act should be construed strictly; for, though the question involved in this case is one of construction as to what corporations should enjoy the privileges conferred by the Act, that is, in a sense, a question of the identity of the class of corporations, rather than a question of construction as to what powers and privileges were intended to be conferred, still such extraordinary powers and privileges as are conferred should not be held to have been conferred more widely or generally than was clearly intended. If it were an even question from the wording of the Act whether the Legislature intended to confer these unusual powers over the private rights of persons upon any individuals whomsoever who might incorporate for the purposes of constructing any railway whatsoever and wheresoever or to confer them only for the purposes of such railways as should be constructed in pursuance of a contract which would insure their public utility, the presumption would be in favor of the latter construction. However, in our opinion, the construction of the Act is sufficiently plain not to require recourse to this presumption. We touch upon this point because it was raised in argument and to show at least that this is not a case for the application of a rule of liberal construction. We shall endeavor to construe the Act as if there were no presumption either way.

The theory of the defendant is, mainly, that the provisions of the contract referred to in the first sections of the Act are those

set forth in Sections 2, 27 and 29, in other words, that the contract was to consist merely of a grant of aid in the shape of government lands, subsidy and exemption from taxation, and that the right of eminent domain is granted directly by the Act, as shown by the change in construction in the sections relating to eminent domain which begin with, "The corporation may," &c., while the sections relating to aid begin with, "The Minister shall have power," &c. It is argued that the contract must be either (1) for aid, or (2) for aid and eminent domain, or (3) for anything whatever, such as regulation of rates, in which last case it is claimed the charter is a sufficient contract. It seems to us that there is a fourth construction which is the correct one. It is that the contract is to be, as specified in the Act (first section), "for the purpose of building and operating a railroad or railroads," and that if such a contract is made in pursuance of the Act, the corporation may then by force of the Act itself exercise the right of eminent domain and that the Minister may also grant aid in addition, perhaps either in the original contract or by a separate grant. The whole frame of the Act favors this construction. The Act provides for a contract in the very first section, tending to show at least that this was a leading idea in the minds of the Legislature. The other provisions of the Act are incidental to and in aid of the purposes of the main contract for the building and operating of the railroad. A contract having been made for this purpose, the Minister may by way of assisting in the execution of the purpose grant special aid and the right of eminent domain also is conferred as a necessary means of carrying out the main purpose. If the aid alone were intended to be the subject of the contract the Act would hardly have been framed or arranged as it was. We should hardly expect Sections 27 and 29 to be so widely separated from Section 2, if these were to form the substance of the contract authorized by Section 1. There is nothing to indicate that Sections 2, 27 and 29 were to form the substance of the contract. The contract is not said to consist of those provisions; the Minister is not authorized to enter "into a contract," *namely, by granting* the kinds of aid

set forth in those sections, nor are any other words of similar effect used. On the contrary, Section 2 begins, *"And* the said Minister * * * shall have power," &c., as if a power in addition to and not identical with that set forth in Section 1 were given. And Sections 27 and 29 are even more emphatic. They begin, *"And be it further enacted,"* as if an additional and different power were being conferred. Moreover, the Minister may *grant* this aid (see Section 2). The Legislature would hardly have spoken of a "grant" by one to another as a contract with another, or have authorized the Minister to *"enter into a contract with* any association of persons," by authorizing him to *"make a grant* of a right of way," to the association. Section 1 implies that the corporation is to undertake something on its part and not merely be the recipient of a favor. It implies a mutual undertaking between two parties, not a one-sided grant by one party. The expressions, "any corporation that shall undertake," &c., in Sections 27, 29 and 30, bear out this idea. The expression, "within the *prescribed* period," in Section 19, also goes to show that the contract contemplated was not intended to consist merely of grants of aid, but that it might prescribe the period within which the works should be completed. There is a change of construction in the Act of 1888 similar to that in the Act of 1878 in the manner in which the sections begin. For instance, Sections 1 and 2 begin with a grant of authority to the Minister, while other sections, including those permitting the exercise of the right of eminent domain, begin with "Such company may," &c., (see Section 6) and yet there is no question that a contract was required under that Act.

Section 3 of the Act of 1878 provides that "for the purposes and subject to the provisions and restrictions of this Act" (not Charter), *"the* corporation may" exercise the right of eminent domain in various specified ways. *"The* corporation" would naturally mean the corporation already mentioned and contemplated by the Act. It means the corporation referred to in Section 1. What corporation is that? Is it the corporation with

which the Minister has entered into a contract "for the purpose of building and operating a railroad," or is it any corporation incorporated under the general corporation law "for the purpose of building and operating a railroad?" In other words, does the last clause of Section 1 go with the word "contract," or with the word "associate"? Defendant argues for the latter construction. The argument is that if the last clause did not go with "associate" then the kind of corporation with which the Minister might contract would not be restricted, and he might contract with any corporation whatsoever, as for instance, a mercantile corporation, for building a railroad, contrary to the purposes of its charter, which would be absurd. But on the other hand it might as well be argued that if the last clause in Section 1 does not go with "contract" the kind of contract which the Minister might make would not be restricted and he might contract for any purpose, as, for instance, the manufacture of toothpicks, which would be equally or more absurd, for it would not only permit the Minister to contract for purposes outside of the charter but it would also confer the right of eminent domain for purely private, that is, unconstitutional purposes. The common sense view is that the Legislature assumed that the Minister would not enter into any such contract as was contemplated by the Act except with a corporation organized for railway purposes. The Legislature would more readily assume that he would contract with a corporation formed for purposes to which the contract was appropriate than that he would not only make a contract appropriate to the purposes of the corporation but also a contract of the particular kind contemplated by the Legislature. It is also argued that if the last clause of Section 1 were intended to go with "contract," the words "purpose of" would have been omitted, that is, that the Legislature would more naturally have said "contract for building" than "contract for the purpose of building." Perhaps so, if their attention had been drawn to the distinction, though this is a matter upon which there might be a difference of opinion. But the fact that nearly four lines intervened between the word "contract" and the words "for the pur-

pose of building" is ample to account for the oversight, if it was an oversight. Separated, as the words are, thus widely, one would not readily detect the slight error in taste in the mode of expression, and considering the Act as a whole, it is evident that the Legislature were not over-careful in their use of language. This question in regard to the word with which the last clause of this section was intended to go, is made perfectly clear by reference to the first section of the Act of 1888. This section was evidently framed on the model of the first section of the Act of 1878, and it is evident both from the last part of the main portion of the section and from the last part of the proviso that the words "constructing and operating" were intended to define the nature of the contract and not the nature of the corporation. In the proviso the Legislature said that the "Minister may contract with *any Hawaiian corporation*," without in any manner defining the nature of the corporation, taking it for granted that the Minister would not contract for the construction of a railroad with any but a railroad corporation. We may add that the same words "for the purpose of building" are used in the very next section (Section 2, Act of 1878) in such a way as to show unmistakably that they were intended to define the purpose of the grant and not the character of the corporation.

It is further argued that the Act of 1878 is a general Act applying to all railway corporations because in Section 5 of the Act of 1890, it is referred to as "the general railway law." It is a "general railway law" as compared with the Act of 1888 which is mentioned just before it in this Section 5 of the Act of 1890 and which authorized the Minister to contract with a particular person or to corporation. The Act of 1878 was general in that it authorized the Minister to contract with any appropriate corporation. The Act of 1888 was special in that it authorized him to contract with a particular appropriate corporation. The Act of 1878 is a "general railway law" in the same sense in which the chapter of the Civil Code on corporations is a "general corporation Act" as it is called in the first section of the Act of 1878 itself. Under this "general corporation Act"

any persons could not, as under a more recent Act (Ch. 43, Laws of 1890), incorporate at will by filing articles of association; they could not incorporate except by obtaining a special charter from the Minister of the Interior with the consent of the King in Privy Council. Similarly, any persons could not acquire the privileges of the Act of 1878 at will after incorporating as a railway corporation; they could not do so except by entering into a contract with the Minister of the Interior with the consent of the King in Privy Council.

Again, it is true that Section 5 of the Act of 1890 refers to the rights, powers and privileges set forth in the Act of 1878 as *granted* by the *Act,* not by the *contract.* It will be noticed on the other hand that Section 2 of the Act of 1888 speaks of these same rights, powers and privileges as if they were con-- ferred through contract with the Minister rather than by the Act. The true explanation seems to be that, as set forth in Section 5 of the Act of 1890, they are granted by the Act— but only to such corporations as have entered into contract with the Minister. Moreover, Section 5 itself (Act of 1890) speaks in the same manner of the rights, powers and privileges set forth in the Act of 1888 as *granted* by that *Act,* not by the *contract,* and yet, as already said, a contract was necessary under that Act. This same Section 5 also, as shown by its proviso, assumes that the provisions of the Act of 1878 relating to special aid were considered as in much the same category as the provisions relating to the other rights, powers and privileges under that Act, that is, that neither set of privileges was regarded as the exclusive subject of the contract.

Section 3 (Act of 1878) provides that, "It (the corporation) may enter upon any lands which may adjoin upon the line of any railway which may be authorized by *charter* to be made," &c. From this it is argued that the corporations which were intended to have these rights of eminent domain are those authorized by *charter* to build a railway, that is, those railway corporations chartered under the general corporation Act, and not those having a *contract* with the Minister. This at first seems plausi-

ble. But in view of the contrary construction which other portions of the Act seem to call for, as above set forth, it would seem as if the use of the word "charter" here were entitled to little weight and further reflection enforces this conclusion. The word "charter" evidently was not used as distinguished from "contract." The question was not whether "charter" or "contract" should be inserted here, but whether either of these words or nothing should be inserted. Later in this same paragraph the word "authorized" is used followed by neither "charter" nor "contract." There is no particular significance in the insertion of the word "charter" here. Its insertion is consistent with either construction contended for. We have already seen that the Legislature assumed that the Minister would not enter into the contract with any corporation not authorized by its charter to build a railroad. It merely expresses here what it omitted to express in other portions of the Act. The use of the word "charter" here is entitled to still less weight from the evident fact that little attention was paid to the language of this clause. The clause, if read literally, means that one corporation may enter upon the lands adjoining the railway of another corporation, which would be absurd. The clause must therefore be read in the light of the rest of the Act, and when so read it may easily be construed in harmony with the construction which we have adopted.

Having decided that the right of eminent domain under this Act may be exercised only by such corporations as have entered into a contract with the Minister of the Interior, and it being admitted that no such contract was entered into by the defendant unless its charter is or contains such a contract, it remains to be considered whether such is the case. The railway was already built and in operation when the owners applied for their charter, the lands necessary for the purposes of the railway having been obtained by private arrangement. The charter, granted in 1881, after reciting that application had been made for a charter of incorporation for the purpose of acquiring, rebuilding, extending and operating a railroad or railroads and that the proper certifi-

cates had been filed as required by Section 1445 of the Civil Code (Ch. XXXI., the general corporation law), constituted the applicants a body corporate for the purpose of building and operating a railroad or railroads between certain points and conferred upon the corporation the usual rights and powers as to succession, suits, seal, holding property, appointment of officers, by-laws, capital stock, location of head office, service of process, liability, &c., and then proceeded: "The said corporation is hereby invested with all the powers, privileges, rights, and immunities which now are or hereafter may be secured by the general corporation law to incorporate companies and is subject to the disqualifications declared by Chapter XXXI. of the Civil Code to be incident thereto." The Charter continues: "This charter is granted and accepted upon the following express conditions," namely, provisions against discrimination in the matter of rates and charges, against unreasonable charges, as to location of stations, and supervision by the Minister of the Interior.

We do not decide that a contract such as is intended in Section 1 of the Act of 1878 may not be embodied in a charter of incorporation, although that section seems to contemplate a contract with a corporation already formed. But it is clear that there was no intention to insert such a contract in the charter in question. The charter is in the usual form, signed by the Minister of the Interior, and the provisions in regard to charges, &c., are, as they are expressed to be, merely "conditions." The charter was evidently intended to be granted as a charter and solely under the general corporation law (Ch. XXXI. of the Civ. Code). This point does not need elaboration.

It remains to consider the defense that the land in question is held by the defendant under certain deeds made by the Crown Land Commissioners prior to the conveyances from the Hawaiian Government to the plaintiff. These alleged deeds were executed by a majority of the Commissioners in 1882 and in them, the Commissioners after reciting that they had no power to sell and convey or release the land in question, unless under the Act of

1878, in terms released all claim for damages that might be done to the land by reason of defendant's taking and use thereof, and covenanted not to interrupt or hinder defendant in the taking or use thereof. This defense seems not to have been much pressed in the lower court. If these alleged deeds are valid, they might perhaps properly be set up as a defense to an action of trespass or ejectment brought by the plaintiff, but we fail to see how they can be set up as a defense to a suit for an injunction to restrain the defendant from proceeding with unlawful condemnation proceedings against the plaintiff's property.

The defendant at present occupies the land in question under certain leases which have but short periods yet to run. It may be in a very unfortunate position at their expiration if it has not then the right of eminent domain. The remedy lies with the Legislature, not with the Court.

The decree appealed from is reversed and a decree for an injunction in conformity with this decision will be signed on presentation.

*A. S. Hartwell* (*Chas. S. Wheeler*, of the San Francisco Bar, with him) for the plaintiff.

*Kinney & Ballou* and *Carl S Smith* for the defendant.