948 P.2d 1103

**ESTATE OF John DOE, a pseudonym, Plaintiff–Appellant/Cross–Appellee,**

v.

**PAUL REVERE INSURANCE GROUP, a Subsidiary of Textron, Inc., James Lui–Kwan, Defendants–Appellees/Cross–Appellants,**

**and**

**John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Roe "Non–Profit" Corporations 1–10; Roe Governmental Agencies 1–10, Defendants.**

**No. 19403.**

Supreme Court of Hawai'i.

Dec. 18, 1997.

Kirk H. Cashmere and David S. Brustein, on the briefs, Honolulu, for plaintiff-appellant/cross-appellee Estate of John Doe.

John R. Lacy and Margaret Jenkins Leong, of Goodsill Anderson Quinn and Stifel, on the briefs, Honolulu, for defendant-appellee/cross-appellant Paul Revere Insurance Group.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

This appeal affords us our first opportunity to construe the application of Hawai'i Revised Statutes (HRS) chapter 431, article 10A, part I (1993), which governs "individual accident and sickness [insurance] policies," to the provisions of a "disability income insurance policy." The outcome-dispositive question presented is whether, under Hawai'i law, the standard "incontestability clause" of such a policy precludes an insurer from denying total disability benefits caused by an insured's HIV infection that arguably "manifested" itself prior to the policy's effective date of coverage, even though (1) the insurer is not seeking to void the policy on the ground that the insured fraudulently misstated his physical or medical condition on his insurance application, (2) the "disease or physical condition" is "not excluded from coverage by name or specific description" as of the effective date of coverage, and (3) the "contestability period" set forth in the policy has already lapsed. We answer the question in the affirmative.

In brief, the present dispute arises out of a disability income insurance policy (the policy), issued on October 22, 1985 to the former plaintiff-appellant John Doe (now deceased),[1] by the defendant-appellee Paul Revere Insurance Company (Paul Revere).[2] In November 1991, Doe tendered a claim for benefits, asserting that he was totally disabled due to his HIV infection.[3] After making disability income payments for three months, Paul Revere terminated further benefits and demanded that Doe repay the $4500.00 that he had already received. Paul Revere asserted that Doe's disability was not a covered loss under the terms of the policy because his HIV infection first "manifested" itself before the policy's date of issue. Doe then filed suit, *inter alia*, against Paul Revere, *see supra* notes 1 and 2, alleging claims for relief sounding in breach of contract (first claim), promissory estoppel and unjust enrichment (second claim), specific performance (or any other appropriate equitable remedy) by virtue of waiver, acquiescence, laches, equitable estoppel, and unclean hands (third claim), breach of the duty to deal in good faith (fifth .

---

1. Pursuant to HRS § 325–101 (1993) ("Confidentiality of records and information" relating, *inter alia*, to HIV infection), Doe filed this lawsuit under a pseudonym in order to prevent the public disclosure of his HIV positive status. By stipulation and order filed on August 23 1995, the entire circuit court record was sealed to protect Doe's identity.

    Doe died on September 27, 1997. On November 24, 1997, the special administrator of Doe's estate moved this court to substitute the "Estate of John Doe" as the plaintiff-appellant in the present appeal. We granted the motion on December 2, 1997.

2. By stipulation and order, filed on August 25, 1995, the parties substituted Paul Revere Insurance Company for Paul Revere Insurance Group, a division of Textron, Inc., as the real party in interest. By further stipulation, filed on September 13, 1995, Doe dismissed with prejudice his claims against James Lui–Kwan, the insurance agent with whom Doe had dealt during the process of applying for the policy. Accordingly, Lui–Kwan is not a party to this appeal.

3. On August 25, 1995, the parties stipulated that, "for purposes of the litigation in the above-captioned matter and all matters related thereto, plaintiff John Doe has been totally disabled within the meaning of [the policy] due to HIV infection as of October 29, 1991 and continues to remain totally disabled thereunder."

claim), and unfair and deceptive trade practices (sixth claim).[4]

Doe appeals from the circuit court's judgment entered in favor of Paul Revere and against Doe after the circuit court granted Paul Revere's motion for summary judgment. Doe asserts as points of error that the circuit court: (1) erred in ruling—notwithstanding that the "contestability" period had run—that the policy's "incontestability" clause did not bar Paul Revere from denying coverage for an illness that first "manifested" itself prior to the policy's effective date; (2) erred in ruling that Doe's HIV infection constituted a preexisting condition excluded from coverage under the policy; (3) misapplied the appropriate standard to determine when a condition is "manifest" where an insured has previously sought medical care or treatment; (4) erred in ruling that Doe's condition was "manifest" prior to the policy's effective date; and (5) misconstrued the medical evidence in ruling that it was undisputed that Doe had received treatment for HIV infection prior to the policy's effective date.[5]

It is unnecessary for us to reach Doe's third, fourth, and fifth points of error in order to render our decision in this appeal. Because we agree with Doe's first two points,

and for the reasons discussed in this opinion, we (1) vacate the circuit court's judgment and (2) remand this case for (a) the entry of an order granting partial summary judgment as to liability in favor of Doe's estate and against Paul Revere regarding Doe's first claim for relief (breach of contract) and (b) further proceedings, consistent with this opinion, regarding (i) the estate's damages in connection with the first claim for relief and (ii) all remaining issues regarding the second, third, and fifth claims for relief.

## I.  BACKGROUND

The record reflects the following undisputed facts: Doe was a dentist, who sought treatment in May 1983 from E. Blossom Wang, M.D., for nonspecific symptoms, including swelling of the lymph glands,[6] occasional diarrhea, and fatigue. Doe was diagnosed as having amebiasis, which was successfully treated with an antimicrobial.[7] Dr. Wang's records also indicate that Doe's "helper-suppressor ratio revealed a decreased helper to suppressor ratio with lower normal helper cells and decreased suppressor cells[,] which *may* indicate immune deficiency status." (Emphasis added.)[8] Nevertheless, at that time, Doe ex-

4. Doe's fourth claim for relief alleged negligence against Lui–Kwan and was among those dismissed by stipulation of the parties on September 13, 1995. *See supra* note 2. On June 6, 1995, Paul Revere and Lui–Kwan moved for partial summary judgment as to Doe's sixth claim for relief, namely, unfair and deceptive trade practices. In his responsive memorandum, Doe conceded that the claim was "[i]napplicable to the [b]usiness of [i]nsurance." Accordingly, the circuit court granted the motion. Doe has not challenged the disposition of his sixth claim for relief on appeal.

5. On cross-appeal, Paul Revere urges that, inasmuch as it was the prevailing party, the circuit court erred as a matter of law in denying it an award of costs in the absence of any finding of "fault" in connection with the conduct of its defense. In light of our disposition of Doe's appeal, Paul Revere is no longer the "prevailing party." Accordingly, the cross-appeal is moot, and we do not address it.

6. Dr. Wang characterized Doe's condition as "diffuse lymphadenopathy." "Lymphadenopathy" literally means "disease of the lymph nodes." *Taber's Cyclopedic Medical Dictionary* 1139–40 (18th ed.1997). Doe's particular manifestation—swelling of the lymph glands—, how-

ever, was not a primary "disease" in itself, in the sense of being "a pathological condition of the body that presents a group of clinical signs, symptoms, and laboratory findings peculiar to it and setting the condition apart as an abnormal entity differing from other normal or pathological condition[s]," *id.* at 552, but, rather, was symptomatic of a variety of diseases, both "serious and nonserious," including, *inter alia*, allergies, infectious mononucleosis, syphilis, Hodgkin's disease, and AIDS.

7. Amebiasis is a parasitic infection caused by entamoeba histolytica, a species of parasitic protozoa that commonly affects the digestive tract. It is *not* an HIV-specific infection. *See infra* note 9. Doe's infection resolved after treatment with the drug Metronidazole (brand name: Flagyl®).

8. The helper/suppressor—or "T cell"—ratio is the ratio of CD4 (helper) lymphocytes to CD8 (suppressor) lymphocytes and is a diagnostic tool used in evaluating the functioning of the immune system. "T4 (CD4) or helper cells ... are the primary cells attacked by the human immunodeficiency virus (HIV) in AIDS." *Taber's Cyclopedic Medical Dictionary* at 342.

hibited delayed hypersensitivity reactions to two of five antigens administered subcutaneously—a result that was not compatible with a diagnosis of AIDS.[9] Furthermore, the result of a gallium scan, ordered by Dr. Wang to detect the presence of AIDS-related infection or malignancy, was "basically normal."

Dr. Wang referred Doe to Steven Berman, M.D., an infectious disease specialist, to attempt to rule out AIDS as a possible diagnosis. Although his clinical record of Doe's July 20, 1983 examination indicates "POTENTIAL AIDS," Dr. Berman testified that this notation did not indicate that an AIDS diagnosis had been established; rather, in light of the intense publicity being given to AIDS (which was newly discovered as of the early 1980s), it reflected that Doe, like many other persons, was seeking medical evaluation because he had learned that he was in a high risk epidemiological group—such as homosexual and bisexual men, intravenous drug users, or persons with a history of blood transfusions—and desired reassurance that he was not infected with the HIV virus. Indeed, following his clinical examination, Dr.

Berman noted in his records that Doe was a "[h]ealthy dentist" and recommended only that Doe revisit as needed. Doe did not see Dr. Berman again until 1986.

In a July 1985 health assessment, Dr. Wang reported that Doe's (1) leukopenia,[10] first observed in 1983, was "stable and improving," (2) 1983 "[a]bnormal T cell helper to suppressor ratio" had been "repeated in January of 1985 and [was] recently completely normal," and (3) "diffuse lymphadenopathy," noted in 1983, was "[n]ow completely resolved," and that, when she had "last seen [Doe] in 1985, both January and February, he looked well physically and had no complaints."

In October 1985, Doe completed a preprinted application form, prepared by Paul Revere, seeking policies insuring him for "disability income" and "overhead expense." Doe disclosed on the application that Dr. Wang had examined and treated him and had performed various laboratory tests. In connection with his insurance application, Doe was examined by a paramedic, who was under contract with Paul Revere, and agreed to

**9.** In these tests, Doe was administered a small amount of antigen subcutaneously in order to determine his ability to mount a delayed hypersensitivity reaction, which is a measure of cell-mediated immunity. A positive reaction indicates that a patient (1) has had a previous exposure to the antigen and (2) is capable of mounting a cell-mediated immune response. People with a variety of immune deficiencies, including AIDS, are unable to mount a positive response to these antigen challenge tests. Hence, a positive result is a useful diagnostic tool in ruling out AIDS. A negative response, however, is not conclusive in diagnosing immune deficiency. It may merely indicate that the individual being tested has never been exposed to the antigen being used for the test and, therefore, has not produced antibodies specific to that particular antigen. For example, Doe exhibited a negative response to tuberculosis antigen. While this result *might* result from an immune deficiency, it would also occur if Doe, like the majority of Americans, had simply never been exposed to tuberculosis or received the BCG tuberculosis vaccine, which is rarely administered in this country.

It should be noted that, in 1983, a serological test for HIV infection was not yet available. While physicians relied on such indices as the helper/suppressor ratio, *see supra* note 8, and skin tests to determine delayed hypersensitivity reaction, these tests could only *suggest*, but not *confirm*, the presence of AIDS, which was nor-

mally diagnosed as a conclusive matter only after a patient developed an opportunistic infection. In fact, at the time, the Centers for Disease Control defined a case of AIDS as the occurrence of "a disease, at least moderately predictive of a defect in cell-mediated immunity, occurring in a person with no known cause for diminished resistance to that disease." *Update on Acquired Immune Deficiency Syndrome (AIDS)—United States*, 31 Morbidity and Mortality Weekly Report 508 (1982). Such AIDS-defining diseases included: Karposi's sarcoma; *Pneumocystis carinii* pneumonia;

> pneumonia, meningitis, or encephalitis due to one or more of the following: aspergillosis, candidiasis, cryptococcosis, cytomegalovirus, nocardiosis, strongyloidosis, toxoplasmosis, zygomycosis, or atypical mycobacteriosis (species other than tuberculosis or lepra); esophagitis due to candidiasis, cytomegalovirus, or herpes simplex virus; progressive multifocal leukoencephalopathy; chronic enterocolitis (more than 4 weeks) due to cryptosporidiosis; or unusually extensive mucocutaneous herpes simplex of more than 5 weeks duration.

*Id.* at 507–08.

**10.** "Leukopenia" means an "[a]bnormal decrease of white blood corpuscles," which may be caused by a "great number of drugs," as well as "failure of the bone marrow." *Taber's Cyclopedic Medical Dictionary* at 1101.

submit to medical testing.[11] Despite the fact that Doe executed a release authorizing Paul Revere to review his medical records, Dr. Wang's records reflect no request from Paul Revere to do so, although they do document that she submitted clinical records and a medical report to two life insurance companies, which appear to have refused Doe coverage on the basis of his medical history.

As noted above, Paul Revere issued the policy to Doe on October 22, 1985. It appears to be uncontroverted that, at all times relevant to this litigation, Doe maintained the policy in full force and effect by making timely payment of all required premiums.

Pursuant to its terms, the policy obligated Paul Revere, as a general matter, to pay Doe "the benefits provided in this Policy for loss due to Injury or Sickness." The term "Sickness" (as opposed to "sickness"), the construction of which is pivotal to our analysis, was contractually defined to mean "sickness or disease *which first manifests itself* after the Date of Issue while [Doe's] Policy is in force." (Emphasis added.)

Specifically, the policy contracted in relevant part to

> pay the Total Disability benefit during [Doe's] continuous Total Disability.[12] The monthly amount [Paul Revere] will pay is shown on the Policy Schedule.[13]

> This benefit will begin on the Commencement Date.[14] [Paul Revere] will continue

to pay it while [Doe] remain[s] Totally Disabled. But in no event will [Paul Revere] pay beyond the Maximum Benefit Period.[15] . . .

The policy, however, contained the following exclusion:

### 3.2 PRE-EXISTING CONDITIONS LIMITATION.

[Paul Revere] will not pay benefits for a Pre-existing Condition if it was not disclosed on [Doe's] application. Also, [Paul Revere] will not pay benefits for any loss [Paul Revere] ha[s] excluded by name or specific description.

In connection with the "pre-existing conditions limitation," the policy defined a "Pre-existing Condition" as a

> *Sickness* [as opposed to "sickness"] or physical condition for which, *prior to the Date of Issue:*
>
> a. *Symptoms existed* that would cause an ordinarily prudent person to seek diagnosis, care, or treatment; *or*
>
> b. *Medical advice or treatment was recommended by or received from a Physician.*

(Emphases added.) Nevertheless, the policy contained the following "incontestability" provision:

### 10.2 INCONTESTABLE.

> a. After [Doe's] Policy has been in force for two years, excluding any time [Doe is] Disabled, [Paul Revere] cannot contest the statements in the application.
>
> b. No claim for loss incurred or Disability[16] beginning after two years from

---

11. The paramedic testified in deposition that only a urinalysis was performed.

12. The policy defined "Total Disability" as follows:

> 1.10 "Total Disability" means that because of injury or Sickness:
>
> a. [The insured is] unable to perform the important duties of [his] regular occupation; and
>
> b. [The insured is] not engaged in any other gainful occupation; and
>
> c. [The insured is] under the regular and personal care of a Physician.

13. Doe's initial "rate of monthly indemnity" was $1000.00. In 1987, and in consideration of an increased annual premium, Doe elected to increase the monthly amount to $1500.00.

14. The "Commencement Date," being "the day shown on the Policy Schedule when benefits begin during a continuous period of Disability," was defined as the "31st day of disability."

15. The "Maximum Benefit Period," being the "longest period of time [Paul Revere] will pay benefits during any continuous period of Disability," was defined as "to age 65."

16. The policy defined "Disability" to mean "Total Disability or Residual Disability." *See supra* note 12. (The contractual definition of "Residual Disability" is not material to the present appeal.) The onset of "disability" triggered a premium waiver in relevant part as follows:

> 9.1 WAIVER OF PREMIUM.
> After [Doe] ha[s] been Disabled for 90 consecutive days, [Paul Revere] will waive any premium that becomes due while [Doe] remain[s] Disabled. [Doe's] Policy and its benefits will continue as if the premium had been paid. [Paul Revere] will also refund any premium that became due and was paid during those first 90 days of Disability.

the Date of Issue will be reduced or denied because a disease or physical condition existed before the Date of Issue unless it is excluded by name or specific description.

Finally, the policy acknowledged the obvious:

**10.3 CONFORMITY WITH STATE STATUTES.**

Any provision in this Policy which, on the Date of Issue, conflicts with the laws of the state in which [Doe] reside[s] on that date is amended to meet the minimum requirements of such laws.

The policy's date of issue being October 22, 1985, Paul Revere became contractually bound by its terms—including the "pre-existing condition" and "incontestability" provisions—as of that time.

In November 1985, subsequent to the issuance of the policy, Doe sought testing from a public health clinic and learned that he was HIV positive and therefore infected with the AIDS virus. In October 1986, he returned to Dr. Berman to begin treatment for AIDS. Five years later, in October 1991, because of "mental anguish" over the possibility that he might "infect patients or that they [might] discover [his] HIV infection," Doe sold his dentistry practice and applied for disability benefits under the policy.

On November 29, 1991—the "commencement date" described in the policy, *see supra* note 14—, Paul Revere began paying Doe monthly total disability benefits. By letter dated February 5, 1992, Paul Revere advised Doe that, inasmuch as his disability had continued for a period of ninety consecutive days, he was "eligible for the Waiver of Premium Benefit as stated in [the] policy." *See supra* note 16. Accordingly, "[e]ffective with the premium due November 22, 1991, [Paul Revere] ... waive[d] the payment of premium and automatically ke[pt the] policy in force."

Nevertheless, by letter directed to Doe's attorney and dated April 10, 1992, Paul Revere took the position that Doe's AIDS-related disability was not a "covered loss" under the terms of the policy and that Doe was therefore not entitled to any benefits:

[Doe's] file has been reviewed[,] and at this time we would like to explain the status of his claim.

The medical records of Dr. Elsie Blossom Wang have been received and reviewed by our medical consultant and our legal department. These records indicate that *[Doe's] current disabling condition first manifested itself prior to the date of issue of [the] policy*.... [Doe's] contract defines "Sickness" as[ ] a "... sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force." *As [Doe's] current disabling condition does not satisfy the contractual definition of "Sickness", it is not a covered loss under the terms of his policy.* Please be advised that *we are not contesting [Doe's] contract;* [17] however, we are unable to provide benefits for his current disabling condition as it is not a covered loss under the terms of his contract.

Prior to our receipt of Dr.... Wang's records[,] we had provided [Doe] with disability benefits totalling $4500.00. As this amount constitutes an overpayment of benefits, we will need to receive repayment of the $4500.00. We have enclosed a postage paid return envelope for your use in returning the overpaid benefits to us.

As *[Doe] is not disabled under the terms of his contract,* he is not eligible for the Waiver of Premium benefit provided for in his policy. As a result, we will need to receive payment in the amount of $420.06, representing premium payments due from November 22, 1991 through April 22, 1992. This premium amount will pay [Doe's] policy to May 22, 1992. This amount will need to be received within 30 days from the date of this letter in order to prevent [the] policy ... from lapsing.

We look forward to receipt of [Doe's] check in the amount of $4500.00, representing a repayment of benefits issued un-

---

17. Consistently, on August 25, 1995, the parties stipulated that "Paul Revere ... waive[s] the affirmative defense of fraud and misrepresentation as a basis to rescind [the policy]." Paul Revere, however, "reserve[d] the right to raise misrepresentations that [Doe] may have made with regard to the policy to the extent permitted by [the circuit] court." In other words, Paul Revere stipulated that the policy was not void on the basis that Doe had fraudulently misstated his physical or medical condition on the insurance application form.

der his current claim, and his check in the amount of $420.06, representing premium payments due from November 22, 1991. (Some ellipsis points added and some in original.) (Emphases added.) By further letter to Doe's attorney, dated July 6, 1992, Paul Revere elaborated upon its position by advising "that the Incontestable clause contained in [Doe's] contract does not preclude us from denying a claim that first manifests itself prior to the Date of Issue, as such a claim is excluded by specific description under the definition of sickness."[18]

On October 5, 1992, Paul Revere notified Doe's attorney that it was closing its files on his claim. Doe thereafter initiated his action against Paul Revere by amended complaint filed on February 8, 1993.

On June 6, 1995, Paul Revere filed a motion for summary judgment as to all claims raised in Doe's amended complaint, "on the grounds that the condition for which [Doe] claims disability is not a '[S]ickness' under the terms of the subject policy[,] and [Doe] therefore cannot receive benefits thereunder." By order filed on August 21, 1995, the circuit court denied the motion, ruling that, although "an incontestability clause does not bar an insurer from denying coverage for a sickness or disease which manifests prior to the effective date of an insurance policy" (citations omitted), "there [were genuine] issues of [material] fact regarding whether [Doe's] HIV disease or AIDS manifested itself prior to the effective date of the [policy]."

On August 25, 1995, Paul Revere moved the circuit court to reconsider its order, based substantially on the deposition testimony of Dr. Wang, which had not been completed until August 8, 1995. The circuit court granted the motion by order filed on September 8, 1995, in which the circuit court ruled in relevant part as follows:

... [T]he court finds and concludes as a matter of law that [Doe's] medical condition was preexisting in character and manifest to [Doe] before the effective date of the ... policy because he knew or should have known of the existence of his condition since the symptoms which he was experiencing led him or would lead a reasonable person to seek medical care and treatment.

. . . .

... [T]he court further finds and concludes as a matter of law that [Doe's] disability due to HIV infection[,] which is the subject of [Doe's] November 1991 claim for benefits[,] is a pre-existing condition which is excluded from coverage for disability benefits under the ... policy.

Therefore, [Paul Revere's] ... Motion for Summary Judgment ... is granted ... as follows.

Summary judgment is granted in favor of [Paul Revere] and against [Doe] on [Doe's] First, Second, Third and Fifth Causes of Action....

Final judgment was entered in favor of Paul Revere and against Doe on September 26, 1995. This appeal followed.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

■ We review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

18. It is apparent from the record that Paul Revere regards a sickness or disease that has "manifested itself" as being synonymous with one that is *symptomatic*. Exactly one week prior to sending its July 6, 1992 letter to Doe's attorney, Paul Revere inquired in writing of its medical consultant whether Doe's "medical records indicate[d] [he] met the *requisite symptomatology* for a *diag-nosis of AIDS* at any time prior to *10/22/85?*" (Emphases in original.) Consistently, Paul Revere frames one of the questions presented on appeal as "[w]hether Doe's condition was manifest as a matter of law where he *displayed symptoms* of HIV infection prior to the policy's inception." (Emphasis added.)

is entitled to a judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*Morinoue v. Roy*, 86 Hawai'i 76, 80, 947 P.2d 944, 948 (1997). Moreover, this court is empowered to order [the] lower court to enter summary judgment in favor of [a] non-moving party where no genuine issue as to any material fact exist[s] and [the] non-moving party [is] entitled to summary judgment as a matter of law[,] even though [the non-moving] party failed to file a cross motion for summary judgment in the lower court.

*First Ins. Co. of Hawai'i, Inc. v. State*, 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (citing *Flint v. MacKenzie*, 53 Haw. 672, 501 P.2d 357 (1972)).

## B. *Statutory Interpretation*

"[T]he interpretation of a statute [or ordinance] is a question of law reviewable *de novo*." *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903

(1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be

called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Cullen,* 86 Hawai'i 1, 7–8, 946 P.2d 955, 962–963 (1997).

## III. *DISCUSSION*

A. *General Legal Principles, The Controlling Hawai'i Statutes, And The Ambiguous Language Of The Policy*

We begin our analysis with the observation that "'... insurers have the same rights as individuals to limit their liability[ ] and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public policy.'" *First Ins. Co. of Hawai'i, Inc. v. State,* 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (quoting 6B Appleman, *Insurance Law and Practice* § 4255, at 40 (1979))... As such, "[insurance] policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended[.]" *Id.* at 423–24, 665 P.2d at 655 (citations omitted). Moreover, "[every] insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy[.]" ... [ ]HRS[ ] § 431:10–237 [°(1993) ]; *see State Farm Mut. Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Smith v. New England Mutual Life Ins. Co.,* 72 Haw. 531, 534, 827 P.2d 635, 636 (1992).

Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that "[b]ecause insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer." *Sturla, Inc. v. Fireman's Fund Ins. Co.,* 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (citations and internal quotation marks omitted) (cited with approval in *Fermahin,* 73 Haw. at 556, 836 P.2d at 1077). "Put another way, the rule is that policies are to

be construed in accord with the reasonable expectations of a layperson." *Id.* In addition, "[insurance] policies are governed by statutory requirements in force and effect at the time such policies are written.... Such provisions are read into each policy issued thereunder[ ] and become a part of the contract with full binding effect upon each party." *AIG Hawai'i Ins. Co., Inc. v. Estate of Caraang,* 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citations and internal quotation marks omitted). Consequently, "[w]hen the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." *Sol [v. AIG Hawai'i Ins. Co.],* 76 Hawai'i [304,] 307, 875 P.2d [921,] 924[, *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890 (1994) ]; *see also Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.,* 73 Haw. 385, 395–96, 834 P.2d 279, 285, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992); [*National Union Fire Ins. Co. v.] Olson,* 69 Haw. [559,] 563–64, 751 P.2d 666, 669 (1988); *Walton v. State Farm Mut. Auto. Ins. Co.,* 55 Haw. 326, 328, 518 P.2d 1399, 1400–01 (1974); *Columbia Casualty Co. v. Hoohuli,* 50 Haw. 212, 214–15, 437 P.2d 99, 102 (1968).

*Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 121–22, 883 P.2d 38, 42–43, *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994) (some brackets and ellipsis points added and some in original) (footnote omitted). *See also Barabin v. AIG Hawai'i Ins. Co.,* 82 Hawai'i 258, 260, 921 P.2d 732, 734 (1996) ("'[w]hen the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract'" (quoting *Dawes* ) (brackets in original)); *AIG Hawai'i Ins. Co. v. Vicente,* 78 Hawai'i 249, 251, 891 P.2d 1041, 1043 (1995) ("insurance policies are governed by statutory requirements in force and effect at the time such policies are written.... Such provisions are read into each policy issued thereunder, and become a part of the contract with full binding effect upon each party" (citation and internal quotation marks omitted) (ellipsis points in original)); *AIG Hawai'i Ins. Co. v. Smith,* 78 Hawai'i 174, 183, 891 P.2d 261, 270 ("'[b]ecause insurance policies are contracts of

adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer'" (quoting *Dawes* ) (brackets in original)), *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995).

As of October 22, 1985 (*i.e.*, the policy's date of issue), "disability income" insurance policies, such as that issued to Doe by Paul Revere in this case, were governed by HRS §§ 431–461 through 431–500 ("Accident and Sickness Insurance") of the Hawai'i Insurance Law, HRS ch. 431 (1985). Effective July 1, 1988, the Insurance Law was replaced by a newly enacted Insurance Code, HRS ch. 431. 1987 Haw. Sess. L. (Vol.2) Act 347, §§ 1–2, 4 at 1–342. The purpose of the new Insurance Code was "to recodify, without substantive change, the insurance law in effect immediately prior to July 1, 1988." HRS § 431:1–100.5 (1993). Accordingly, HRS §§ 431–461 through 431–500 (1985) were replaced by HRS chapter 431, article 10A, part I of the Code ("Individual Accident and Sickness Policies"), presently located at HRS §§ 431:10A–101 through 431:10A–117 (1993 & Supp.1997). For the sake of simplicity, we will refer in our analysis to the current sections of the Code, noting their previous designations parenthetically.

"The term[ ] policy of accident and sickness insurance[ ] includes any policy or contract covering the class of insurance described in [HRS § ] 431:1–205." HRS § 431:10A–102 (1993) (formerly HRS § 431–462 (1985)). HRS § 431:1–205 (1993) (formerly HRS § 431–7 (1985)) provides:

**Disability insurance defined.** *Disability insurance,* also referred to as accident and sickness insurance, *is insurance* against bodily injury, disablement, or death by accident, or accidental means, or the expense thereof; *against disablement or expense resulting from sickness;* and every insurance appertaining thereto.

(Emphases added.)

HRS § 431:10A–105 (1993) (formerly HRS §§ 431–464 through 431–476 (1985)) provides in relevant part:

**Required provisions.** Except as provided in section 431:10A–107,[19] each policy of accident and sickness insurance delivered or issued for delivery to any person in this State shall contain the provisions set forth below. These provisions shall be in the words in which they appear below, provided that the insurer may substitute corresponding provisions of different wording approved by the [insurance] commissioner which are in each instance not less favorable in any respect to the insured or the beneficiary. The provisions shall be preceded individually by the specified caption, or by such appropriate individual or group captions or subcaptions as the commissioner may approve. The provisions are as follows:

. . . .

(2) (A) "Time Limit on Certain Defenses:

(i) *After three years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for this policy shall be used to void this policy or to deny a claim for loss incurred or disability* (as defined in the policy) *commencing after the expiration of the three-year period.*

(ii) *No claim for loss incurred or disability* (as defined in the policy) *commencing three years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on*

---

19. HRS § 431:10A–107 (1993) (formerly HRS § 431–488 (1985)) provides:

**Inapplicable or inconsistent provisions.** If any provision of section 431:10A–105 to section 431:10A–111 is in whole or in part inapplicable to or inconsistent with the coverage provided by a particular form of policy, the insurer, with the approval of the [insurance] commissioner, shall omit from such policy any inapplicable provision or part of a provision,

and shall modify any inconsistent provision or part of the provision in such manner as to make the provision as contained in the policy consistent with the coverage provided by the policy.

The provisions of HRS §§ 431:10A–105(2)(A) and (C), discussed *infra,* are entirely applicable to and consistent with the class of coverage provided by the policy in the present case.

the date of loss had existed prior to the effective date of coverage of this policy."

. . . .

(C) A policy which the insured has the right to continue in force subject to its terms by the timely payment of premium until at least age fifty or, in the case of a policy issued after age forty-four, for at least five years from its date of issue, may contain in lieu of subparagraph (A)(i) the following provision (from which the clause in parentheses may be omitted at the insurer's option): "Incontestable: After this policy has been in force for a period of three years during the lifetime of the insured (excluding any period during which the insured is disabled), it shall become incontestable as to the statements contained in the application."

(Emphases added.)

■ Statutes, such as HRS §§ 431:10A–105(2)(A) and (C), requiring incontestability clauses are not unique to Hawai'i. "[A]pproximately 47 states have enacted legislation requiring life, disability, and health insurance policies to contain incontestability clauses as tools to promote certainty and reduce litigation." *Oglesby v. Penn Mut. Life Ins. Co.*, 889 F.Supp. 770, 774 (D.Del. 1995) (citing *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. 995, 1000 (S.D.Ind. 1989), and Eric K. Fosaaen, *AIDS and the Incontestability Clause*, 66 N.D. L.Rev. 267, 270–71 (1990)).

Incontestability clauses set temporal limits on an insurer's right to challenge its insurance policy. *See, e.g., Velez–Gomez v. SMA Life Assurance Co.*, 8 F.3d 873, 875 (1st Cir.1993) (two year period of contestability as to statements by the insured during application process). Historically, these clauses arose as a reaction to the "early greed and ruthlessness of the insurers," 7 Williston on Contracts § 912 at 394

(3d ed.1963), who were apt to deny benefits years after the policy had issued based on technicalities or pre-existing conditions. *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190, 644 A.2d 1098, 1102 (1994); *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. 995, 1000 (S.D.Ind.1989). As a result, many beneficiaries, especially those claiming under life or health insurance policies, were left in the untenable predicament of litigating against powerful insurance carriers. *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. 995, 1000 (S.D.Ind.1989).

*Id.* Accordingly,

[s]uch clauses are designed to "require the insurer to investigate and act with reasonable promptness if it wishes to deny liability on the ground of false representation or warranty by the insured." G. Couch, 18 *Couch on Insurance* § 72:2 at 283 (1983). "It prevents an insurer from lulling the insured, by inaction, into fancied security during the time when the facts could be best ascertained and proved, only to litigate them belatedly, possibly after the death of the insured."[20] *Id.* at 283–84.

*Insurance Comm'r of Maryland v. Mutual Life Ins. Co. of New York*, 111 Md.App. 156, 680 A.2d 584, 593 (Md.Ct.Spec.App.1996) (quoting *Wischmeyer*, 725 F.Supp. at 1000).

■ Being remedial statutes,[21] HRS §§ 431:10A–105(2)(A) and (C) "are 'to be construed liberally in order to accomplish the purpose for which [they were] enacted. . . . [Remedial] statutes are liberally construed to suppress the [perceived] evil and advance the [enacted] remedy.'" *Dawes*, 77 Hawai'i at 123, 883 P.2d at 44 (quoting *Flores v. United Air Lines, Inc.*, 70 Haw. 1, 12, 757 P.2d 641, 647 (1988)) (brackets and ellipsis points in original). Moreover, as noted above, inasmuch as "[every] insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy," HRS § 431:10–237, and, because in-

---

20. *See supra* note 1.

21. "Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." N. Singer, 3 *Sutherland, Statutes and Statutory Construction* § 60.02 (4th ed.1986) (footnote

omitted). . . . "Modern social legislation is generally regarded as being remedial in nature. 'Socioeconomic' legislation has been said to be entitled to a liberal construction." *Id.*

*Flores v. United Air Lines, Inc.*, 70 Haw. 1, 12 n. 8, 757 P.2d 641, 647 n. 8 (1988).

surance policies are contracts of adhesion, they must likewise be construed liberally in favor of the insured, any ambiguities in their terms and conditions must be resolved against the insurer. *Id.* at 121, 883 P.2d at 42; *Fermahin,* 73 Haw. at 556, 836 P.2d at 1077; *Sturla, Inc.,* 67 Haw. at 209, 684 P.2d at 964.

Close scrutiny of the policy's terms and conditions in the present case reveals much that is ambiguous, so as foreseeably to confound "the reasonable expectations of a layperson." *See Dawes,* 77 Hawai'i at 121, 883 P.2d at 42; *Sturla, Inc.,* 67 Haw. at 209, 684 P.2d at 964. As noted *supra* in section I, Paul Revere contracted generally to pay Doe "the benefits provided in [the policy] for loss due to ... *Sickness."* (Emphasis added.) The policy defines "Sickness," as a contractual term of art, in relevant part as a "disease *which first manifests itself* after the Date of Issue while [the policy] is in force." (Emphasis added.) Thus, according to Paul Revere, the policy purports to restrict a covered "Sickness" to a "sickness or disease" that was *not* symptomatic, *see supra* note 18, or—according to the plain, ordinary, and accepted sense in common speech—that had *not* "show[n] [itself] plainly," *see Webster's Encyclopedic Unabridged Dictionary of the English Language* 871 (1989) (defining the transitive verb "manifest"), on or before October 22, 1985—the date on which Paul Revere issued the policy to Doe.

Simultaneously, however, the policy excludes coverage "for a Pre-existing Condition if it was not disclosed on [Doe's] application." In this connection, the policy defines a "Pre-existing Condition," as a contractual term of art, in relevant part as a "Sickness ... for which, prior to [October 22, 1985,] ... *[s]ymptoms existed* that would cause an ordinarily prudent person to seek diagnosis, care, or treatment[ ] *or ... [m]edical advice or treatment was recommended by or received from a [p]hysician."* (Emphases added.) Thus, by the policy's plain language, the term "Pre-existing Condition" is an oxymoron because, as of the date of issue, it literally describes an *asymptomatic* or *non-apparent* sickness, which, at the same time, is either so objectively *symptomatic* or sufficiently *apparent* as presently to prompt "diagnosis, care, ... [m]edical advice or treatment."

Meanwhile, the policy's primary undertaking is to "pay the Total Disability benefit during [Doe's] continuous Total Disability." The policy defines "Total Disability," as a contractual term of art, in relevant part as a condition whereby the insured is substantially unable to engage in his or her "regular occupation," is otherwise not gainfully employed, and is under "the regular and personal care of a[p]hysician," all "because of ... Sickness." In other words, the policy defines "Total Disability" as a disability resulting from a disease that is *not* symptomatic and/or has *not* "shown [itself] plainly" as of the policy's date of issue. Thus, because Paul Revere regarded Doe's HIV infection as having been symptomatic prior to the policy's date of issue, it asserted in writing on April 10, 1992 that, insofar as Doe's "current disabling condition does not satisfy the contractual definition of 'Sickness', it is not a covered loss under the terms of his policy," and, therefore, *"[Doe] is not disabled under the terms of his contract."* (Emphasis added.)

On the other hand, as indicated above, a "Pre-existing Condition," as defined by the policy, is a "Sickness," which, as of the date of issue, is simultaneously asymptomatic and symptomatic—a definition that, by bonding mutual exclusivities, both directly contradicts and significantly expands the contractual definition of "Sickness." Moreover, "Total Disability," as defined by the policy, exists as a function of "Sickness."

It appears that not even Paul Revere can navigate the labyrinthine terms of its own contract because, notwithstanding its stated position on April 10, 1992, it stipulated on August 25, 1995 that, "for purposes of the litigation in the above-captioned matter and all matters related thereto, *[Doe] has been totally disabled within the meaning of [the policy] due to HIV infection ... and continues to remain totally disabled thereunder."* (Emphasis added.) *See supra* note 3. Paul Revere's stipulation is nonsensical if (1) the existence of a "Total Disability" is conditioned upon the presence of a "Sickness" that was asymptomatic or that had not "shown [itself] plainly" as of the policy's date of issue and, as Paul Revere contends, (2) Doe's HIV infection *was* symptomatic and *had* "shown [itself] plainly" as of that date. On the other hand, the stipulation makes perfect sense if,

as of the date of issue, Doe was suffering from what Paul Revere regarded as a "Pre-existing Condition," for which it was precluded under the policy from denying a claim for benefits by virtue of the "incontestability" clause.

It is within the context of the foregoing "hall of mirrors," constructed by Paul Revere's contract of adhesion, that we liberally apply HRS §§ 431:10A–105(2)(A) and (C) to the terms and conditions of the policy, in accordance with (1) the general rules of statutory construction set forth *supra* in section II.B, (2) the specific rules of remedial statutory construction governing insurance policies set forth *supra* in this section, and (3) the general rules of contract construction also set forth *supra* in this section, in order to suppress the perceived evil that the statute was designed to address and advance the enacted remedy.

B. *Application Of The Controlling Hawai'i Statutes To The Language Of The Policy*

1. *Exclusion from coverage "by name or specific description"*

■ "Incontestability provisions do not, of course, preclude [disability] insurers from ex-pressly excluding coverage for losses arising from particular causes." *Equitable Life Assurance Soc'y of the United States v. Bell,* 27 F.3d 1274, 1279 (7th Cir.1994) (citations omitted). Indeed, by its plain language, HRS § 431:10A–105(2)(A)(ii) exempts diseases or physical conditions "excluded from coverage by name or specific description" from the general statutory mandate that "[n]o claim for ... disability (as defined in the policy) commencing after three years from the date of issue of th[e] policy shall be ... denied on the ground that a disease or physical condition ... effective on the date of loss had existed prior to the effective date of coverage of th[e] policy."

Paul Revere urges that paragraph 10.2.b of the policy, *see supra* section I, which is ex-pressly mandated by HRS § 431:10A–105(2)(A)(ii), *see supra* section III.A, does not protect Doe because[:] (1) Paul Revere is not denying coverage for Doe's HIV because the condition existed, but because the condition was manifest to Doe prior to the policy['s] date [of issue];[22] and (2) because the policy defines "[S]ickness" to exclude conditions manifest before

22. In this connection, Paul Revere urges on appeal that

[a]llowing the insurer to deny coverage for conditions manifest prior to the policy date [of issue] does not undermine the intent of HRS § 431:10A–105(2)(A)(ii). It is generally recognized that clauses such [as] Paragraph 10.2(b) were intended to protect insureds "who purchased coverage long before a *latent* disease or condition *manifested* itself."

(Quoting *Bell,* 27 F.3d at 1283.) (Emphases added.) From this premise, Paul Revere makes the following argument:

Innocent insureds with latent illnesses are clearly be [sic] protected by Paul Revere's policy, since *only those insureds who can be charged with knowledge of their condition before the policy's inception will be denied coverage.*

The distinction between manifestation and mere existence ... was ... created by the courts, and was designed to strike a balance between the interests of innocent insureds with latent conditions and *insurers seeking to protect themselves from fraud....*

(Emphases added.)

Thus, Paul Revere seems to suggest that HRS § 431:10A–105(2)(A)(ii) was designed in part to assist "insurers seeking to protect themselves from fraud." As *Bell* itself demonstrates, howev-er, Paul Revere confuses the distinct protections accorded insureds and insurers by HRS §§ 431:10A–105(2)(A)(i) and (ii).

We readily acknowledge that there is an intuitive distinction between diseases that manifest and those that exist unbeknownst to the insured. Many disabilities spring from causes that may exist for years without symptoms detectable by an ordinary person. No doubt it is the prospect of denying coverage to a person who purchased coverage long before a latent disabling condition or disease manifested itself which motivated legislators to require provisions akin to paragraph (b). *See, e.g., [Massachusetts Cas. Ins. Co. v.] Forman,* 516 F.2d [425,] 429–30 [ (5th Cir.1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976)]. When the disease has already revealed itself before the policy is purchased, on the other hand, the insured effectively deceives the insurance company by purchasing the policy in silence, knowing that she is likely to become disabled. The evident unfairness of that scenario is perhaps the strongest argument in favor of construing paragraph (b) more narrowly than its plain language would permit. *See Weiner [v. Paul Revere Life Ins. Co.,* No. 90–72772,] 1991 WL 353370, at *3 [ (E.D.Mich. July 31, 1991)] ("an incontestability clause that estops an insurer from deny-

the policy['s] date [of issue], such conditions are excluded by specific description under Paragraph 10.2(b).

We believe, however, that Paul Revere's interpretation of the relevant policy language does violence to the general rules of statutory construction, the specific rules of remedial statutory construction regarding insurance policies, and the general rules of contract construction outlined above.

■ In particular, we agree with the following analysis of the United States Court of Appeals for the Seventh Circuit regarding a disability insurance policy's incontestability clause identical in all material respects to the one at issue in the present case:

> [T]he policy at issue here provides that after two years, disability coverage will not be denied on the ground that the underlying disease or physical condition pre-dated the policy, "unless, effective on the date of the loss, such disease or physical condition was excluded from coverage *by name or specific description*." [The insurer] suggests that this provision alone would bar coverage for [the insured's disability], in view of the policy terms defining covered "sickness" to include only those which first manifest themselves after the policy's effective date and excluding those that manifested themselves before. In our view, however, these terms merely address the general scope of the policy; they do not identify any disease or condition with particularity sufficient to render them excluded by "name or specific description." As Judge McKinney reasoned in *Wischmeyer*:

The most reasonable interpretation of these words is that a *specific* pre-existing condition, i.e., something such as tuberculosis or diabetes, may be specifically excluded from coverage by agreement of the parties if that condition is named or specifically described in the policy. If such an agreement of exclusion is reached by the parties, then the incontestable clause would not prevent the insurer from denying coverage based on *that particular named pre-existing condition*. If, on the other hand, such a specific pre-existing condition is not excluded from coverage by name or specific description, then the insurer cannot deny a claim based on that condition if the plaintiff's disability does not begin until more than two years from issuance of the policy.

> This interpretation simply follows the rule of construction that language in an insurance contract is to be given its plain, ordinary, and common sense meaning. Here the most reasonable interpretation is that in order to benefit from this final phrase of the contestable clause, the insurer must specifically name or describe a particular pre-existing condition, and not merely add a clause in the policy attempting to exclude all pre-existing conditions.

[*Wischmeyer*,] 725 F.Supp. at 1004–05 [ (citations omitted) ] (emphasis in original).

*Bell*, 27 F.3d at 1279–80 (some citations omitted) (emphasis in original).

[ (E.D.Mich.1992) ]; *see also Fischer [v. Massachusetts Cas. Ins. Co.]*, 458 F.Supp. [939,] 944 [ (S.D.N.Y.1978) ]. [The insured] is entitled to the full protection of the incontestability clause.

*Bell*, 27 F.3d at 1283 (emphasis added). Paul Revere concedes in its brief that, under the Hawai'i Insurance Code, "[t]he insurer is given a choice of provisions: one of which provides that the incontestability period is tolled during any period of disability, HRS § 431:10A–105(2)(C), and one of which permits the insurer to contest the policy based on fraudulent misstatements beyond the statutory period, HRS § 431:10A(2)(A)(i)." As the insurer did in *Bell*, Paul Revere opted for the former, chose "to forego [the] protection" of the latter, and "cannot now attempt to regain ... what it surrendered[.]"

---

ing coverage due to the prior manifestation of disease would grant the same degree of protection to insureds who fraudulently misrepresent their medical status").

Even so, we cannot say that the prospect of fraud is enough to sustain a contrary reading of the statutory provisions. Indeed, whatever force this argument carries dissipates entirely when one recalls that *[the insured] had the option of including an alternate version of paragraph (a) that would have preserved the company's right to rescind the policy based on fraudulent misstatements in the insured's application. The company chose instead to forego that protection; and it cannot now attempt to regain through other policy terms what it surrendered in opting for the unconditional language of paragraph (a). [Provident Life & Accident Ins. Co. v.] Altman*, 795 F.Supp. [216,] 222

Accordingly, because we (1) construe the policy (a) according to the entirety of its terms and conditions, *see* HRS § 431:10–237, (b) liberally in favor of the insured, *see Smith,* 78 Hawai'i at 183, 891 P.2d at 270; *Dawes,* 77 Hawai'i at 121, 883 P.2d at 42, and (c) in accord with the reasonable expectations of a lay person, *see Dawes,* 77 Hawai'i at 121, 883 P.2d at 42; *Sturla, Inc.,* 67 Haw. at 209, 684 P.2d at 964, (2) resolve any contractual ambiguities against the insurer, *see Smith,* 78 Hawai'i at 183, 891 P.2d at 270; *Dawes,* 77 Hawai'i at 121, 883 P.2d at 42, (3) read the provisions of HRS §§ 431:10A–105(2)(A) and (C) into the policy, *see Vicente,* 78 Hawai'i at 251, 891 P.2d at 1043; *Dawes,* 77 Hawai'i at 122, 883 P.2d at 43, and (4) liberally construe HRS §§ 431:10A–105(2)(A) and (C) in order to accomplish the purposes for which they were enacted, *see Dawes,* 77 Hawai'i at 123, 883 P.2d at 44; *Flores,* 70 Haw. at 12, 757 P.2d at 647, namely, (a) to suppress the perceived evil of "lulling the insured, by inaction, into fancied security during the time when the facts could best be ascertained and proved, only to litigate them belatedly, possibly after the death of the insured" and (b) to advance the enacted remedy of "requir[ing] the insurer to investigate and act with reasonable promptness if it wishes to deny liability on the ground of false representation or warranty by the insured," *see Insurance Comm'r of Maryland,* 680 A.2d at 593; *Oglesby,* 889 F.Supp. at 774, we hold that the contractual phrase "which first manifests itself after the Date of Issue" contained within the policy's definition of a covered "Sickness," *see supra* section I, does not exclude coverage of Doe's total disability due to HIV infection, *see supra* note 3, "by name or specific description," within the meaning of the second sentence of the policy's "pre-existing conditions limitation," *see supra* section I, or paragraph 10.2.b of the policy's incontestability provision, *see id.*

### 2. Incontestability and "pre-manifesting" illnesses

■ "The more nettlesome question is whether, despite the statutorily required provision prohibiting a denial of coverage for pre-existing illnesses after three (or in this case two) years, the insurer is free to exclude coverage for pre-*manifesting* illnesses."

*Bell,* 27 F.3d at 1280 (emphasis in original). The *Bell* court, which was faced with a disability insurance policy the terms and conditions of which were virtually identical in all material respects to Paul Revere's policy in the present case, had "no doubt that, with the incontestability clause put aside, the policy terms quite clearly eliminate coverage for pre-manifesting illnesses." *Id.* In the present case, however, given the ambiguities inherent in the contractually defined terms "Sickness," "Pre-existing Condition," and "Total Disability," *see supra* section III.A, we are not so certain.

In any event, whether, pursuant to the "'first manifest' doctrine," *see Oglesby,* 889 F.Supp. at 773, the construct of a "preexisting condition" includes "only those diseases and conditions that, although they existed before the policy became effective, did not manifest themselves," on the one hand, or whether that approach "represent[s] an impermissible attempt to restrict the coverage otherwise compelled by the legislature," on the other, "is a question that has sharply divided the courts." *Bell,* 27 F.3d at 1280. And, as was the case in *Bell* and *Oglesby,* the question is one of first impression in Hawai'i.

■ We discern the most satisfying analysis of and answer to the foregoing question in *Oglesby, supra.* Because we agree with that decision as it applies to the issue before us, we quote it at length:

The present issue hinges on construction of the policy's statutorily required incontestability provisions and their impact on the scope of the policy's coverage, which is limited to sickness first making itself known while the policy is in force. *See Equitable Life Assurance Soc'y v. Bell,* 27 F.3d 1274, 1277 (7th Cir.1994) (confronting same dilemma)....

. . . .

... [The insurer] maintains its denial of [the insured's] claim as not within the *scope* of the policy's *coverage,* asserting [the insured's illness] as an excluded condition. The policy explicitly circumscribes its scope of coverage to any sickness "which first makes itself known while this policy is in force." [The insurer] seeks to argue ... that because [the insured's] cur-

rent disability for which he seeks insurance benefits stems from his [predating] disability, it does not fall within the definition of a covered sickness and is therefore excluded.

At first blush, [the insurer's] argument seems like a reasonable interpretation of the policy; upon further scrutiny, however, it meets with terminal difficulty. In addition to the . . . clause concerning misstatements by the insured, Delaware statutory law also requires a policy to include the following provision:

> (2) No claim for loss incurred as disability (as defined by the policy) commencing 2 years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy.

18 Del.C. § 3306(a)(2).[23] This subsection reflects a legislative mandate that if an insured does not suffer disability for two years following the policy's issue date, his claim for benefits cannot be denied on the ground of pre-existing condition. *See Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. at 1001 (construing substantially identical statute).

. . . .

Many courts have been confronted with the dilemma posed in this case: whether, despite the statutorily required provision prohibiting a denial of coverage for pre-existing illnesses after two years, the insurer is able to exclude coverage for pre-manifesting illnesses. *See, e.g., Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190, 644 A.2d 1098 (1994); *Equitable Life Assurance Soc'y v. Bell*, 27 F.3d 1274 (7th Cir.1994); *Neville v. American Republic Ins. Co.*, 912 F.2d 813, 815 (5th Cir.1990) (construing Mississippi law); *Button v. Connecticut Gen. Life Ins. Co.*, 847 F.2d 584 (9th Cir.) (construing Arizona law), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 250 (1988); *Provident Life and Accident Ins. Co. v. Altman*, 795 F.Supp. 216 (E.D.Mich.1992) (construing Michigan law); *Wischmeyer v. Paul Re-*

*vere Life Ins. Co.*, 725 F.Supp. 995 (S.D.Ind.1989) (construing Indiana law); *Massachusetts Casualty Ins. Co. v. Forman*, 516 F.2d 425 (5th Cir.1975) (construing Florida law); *see also* Annotation, *Construction of Incontestable Clause Applicable to Disability Insurance*, 13 A.L.R.3d 1383 (1967) (collecting cases). . . .

Some courts "have concluded that the incontestability clause, despite its reference to 'pre-existing' illnesses and conditions, leaves the insurer free to exclude pre-manifesting diseases and condition [sic] from the policy coverage." *[Bell,* 27 F.3d at 1280] (citing *Button v. Connecticut Gen. Life Ins. Co.*, 847 F.2d at 588–89; *Keaten v. Paul Revere Life Ins. Co.*, 648 F.2d 299, 301–03 (5th Cir.1981); *Allen v. Aetna Life Ins. Co.*, 563 F.2d 1240, 1241–42 (5th Cir.1977)). Many of these courts have reasoned that there is a distinction between conditions that are pre-*existing* as contrasted with those that are pre-*manifesting*. *See, e.g., Paul Revere Life Ins. Co. v. Haas*, 644 A.2d at 1107. If an insured was unaware of the condition, the condition existed but was not manifest, and the insurance company could not use it as a defense; when the insured knew of his condition, the insurer could deny coverage. *Id.* Under this interpretation, the first manifest doctrine denies the benefit of the incontestability clause to insureds who lie on their application. *Id.* As a practical matter, the constructional preference accorded to the policy terms excluding coverage for pre-*manifesting* conditions nullifies the provision barring denials for pre-*existing* conditions. *See Massachusetts Casualty Ins. Co. v. Forman*, 516 F.2d 425, 429–30 (5th Cir.1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976) (under Florida law, pre-existing conditions clause "has no effective field of operation" in light of first manifest clause); *accord Weiner v. Paul Revere Life Ins. Con.*, No. 90–72772, 1991 WL 353370 at *2–3 (E.D.Mich. July 31, 1991).

One court, concluding that insurers should compensate victims without condoning wrongful conduct and fraudulent statements, has reconciled the two provisions

---

23. *Cf.* HRS § 431:10A–105(2)(A)(ii).

by construing the policy's "definition of 'sickness' as operating as an 'exclusion by specific description.'" *Paul Revere Life Ins. Co. v. Haas,* 644 A.2d at 1105. Thus, any sickness manifesting itself prior to the policy's effective date, whether explicitly referenced or not by the insurer, would be excluded.[24] The *Haas* court reasoned [that] any other result would be tantamount to finding the legislature contemplated it was authorizing insureds to "conceal a known disability and then reap the benefit of their deception by recovering for the disability that was so concealed." *Id.* at 1107.

A growing minority of courts have rejected the above rationales by favoring a plain meaning approach to the statutory and policy language. These cases uniformly hold that "if an insured is not disabled for two years after issuance of the policy, then his claim for benefits cannot be denied on the grounds that he had a pre-existing condition." *Wischmeyer v. Paul Revere Life Ins. Co.,* 725 F.Supp. 995, 1001 (S.D.Ind.1989); *accord Equitable Life Assurance Soc'y v. Bell,* 27 F.3d 1274 (7th Cir.1994); *Provident Life & Accident Ins. Co. v. Altman,* 795 F.Supp. 216 (E.D.Mich. 1992); *Manzella v. Indianapolis Life Ins. Co.,* 814 F.Supp. 428 (E.D.Pa.1993); *White v. Massachusetts Casualty Ins. Co.,* 96 A.D.2d 732, 465 N.Y.S.2d 345 (1983); *Fischer v. Massachusetts Casualty Ins. Co.,* 458 F.Supp. 939 (S.D.N.Y.1978); *Taylor v. Metropolitan Life Ins. Co.,* 106 N.H. 455, 214 A.2d 109 (1965). These courts reason that the policy terms defining sickness merely address the general scope of the policy's coverage and "do not identify any disease or condition with particularity sufficient to render them excluded by 'name or description.'" *Equitable Life Assurance Soc'y v. Bell,* 27 F.3d at 1280; *Wischmeyer v. Paul Revere Life Ins. Co.,* 725 F.Supp. at 1004–05. In order to benefit from this final phrase of the incontestability clause, the insurer must specify or describe a particular pre-existing condition and not merely insert a catch-all clause elsewhere in the policy attempting to exclude pre-existing illness. *Id.*

... Conflicting authority notwithstanding, the contractual provisions and relevant state law in this case ultimately directs this Court's analysis. Delaware law dictates that clear language in an insurance policy should be given its ordinary and usual meaning. *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992).

The [insurer's] policy clearly establishes its contractual boundaries by defining coverage for "any sickness that first makes itself known while the policy is in force." Pursuant to legislative mandate, the policy also sets forth what the policy does *not* cover, by way of an incontestability provision relating to what is excluded under the policy. The provision distinguishes between disabilities starting *within* two years of the issuance of the policy, and *after* two years from issuance of the policy. Where, as here, the insured did not suffer disabling symptoms until more than two years after the policy issued, the policy states it does not cover a disability resulting from a pre-existing condition if the policy excludes that condition by name or specific description. The converse is also true: if, after more than two years after the policy issued, a disability arises from a pre-existing condition not specifically excluded, then it is covered.

This "plain meaning" interpretation of the policy is supported by examination of the corresponding statutory language in the Delaware Code, which provides in relevant part that

"No claim for loss incurred as disability ... commencing 2 years from the date of issue of this policy shall be ... denied on the ground that a disease or physical condition not excluded from coverage by name or specific description ... had existed prior to the effective date of coverage of this policy."

18 Del.C. § 3306(a)(2).[25] The clear import of both the statutory and policy provisions is that "if an insured is not disabled for two years after issuance of the policy, then his claim for benefits cannot be denied on the grounds that he had a pre-

---

**24.** We rejected this view *supra* in section III.B.1.

**25.** *See supra* note 23.

existing condition." *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. 995, 1001 (S.D.Ind.1989). The statute requires an unequivocal promise by the insurer that that [sic] after two years, "no disability claim shall be denied on the ground that the underlying disease or condition 'existed' before the policy became effective." *See Equitable Life Assurance Soc'y v. Bell*, 27 F.3d at 1282 (construing substantially identical statute). The statute speaks plainly in terms of "existing," not "manifesting" (or first making itself known); the term "exist" ordinarily refers to a state of being, without qualification as to other qualities, such as manifestation. *Id.* Consequently, in the absence of such a distinction by the legislature, one must conclude that the Delaware legislature intended that a pre-existing condition includes those both known and unknown to the insured prior to the policy date. *See id.*

It is also important to emphasize the crux of this incontestability provision: the onset of disability (as opposed to [the] onset of the pre-existing condition).... By use of the two year period, the legislature struck a balance:

> The clause protects an insured who is healthy enough to work throughout the two-year period from losing the security of disability insurance because of some prior condition that might eventually disable him. On the other hand, the insurer is protected in that it is not precluded from denying benefits to an applicant whose pre-existing condition is so bad that he becomes disabled during the two-year period.[26]

*Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. at 1001–02.

Delaware law requires that language integrated into an insurance policy by force of a statute be interpreted and given effect in accordance with the apparent intent of the legislature. *Suskind v. American Republic Ins. Co.*, 458 F.Supp. at 684 (D.Del. 1978); John A. Appleman and Jean Appleman, 12 *Insurance Law and Practice* § 7043 (1981). Moreover, when any provision in a policy subject to Delaware's health insurance code is in conflict with any provision of that chapter of the code, the rights, duties, and obligations of the insurer, the insured and the beneficiary shall be governed by the provisions as set forth by the legislature. 18 Del.C. § 3331.[27] By choosing language different from the statutory model, [the insurer] "attempts to nullify the protection of the incontestable clause by excluding from coverage" illness which first makes itself known before the policy is issued. *Fischer v. Massachusetts Casualty Ins. Co.*, 458 F.Supp. at 945. [The insurer's] interpretation would thwart the legislatively imposed incontestability clause, and reduce its protection to less than that which was contemplated by the Delaware General Assembly. *Accord Equitable Life Assurance Soc'y v. Bell*, 27 F.3d at 1282....

. . . .

Despite its lachrymose cries, [the insurer] must bear the responsibility for the predicament in which it finds itself.... Delaware law afforded [the insurer] the teeth it needed to contest any and all fraudulent misstatements by [the insured] and to preserve the insurer's right to rescind the policy. *See* Del.C. § 3306(a)(1) (fraudulent misstatements excepted from incontestability clause relating to validity of the policy).[28] [The insurer] took a calculated risk by removing that protection and opting for a more lenient, and thus more marketable version of the incontestability clause.[29] Courts are not in the habit of relieving parties, especially sophisticated insurance companies, of their improvident decisions....

---

**26.** Applied to Paul Revere's policy in the present case, of course, the "Pre-existing Condition" must not have been "disclosed on [the insured's] application" in order for benefits to be denied pursuant to the "Pre-existing Conditions Limitation" set forth at paragraph 3.2 of the policy. *See supra* section I.

**27.** *Cf. Barabin*, 82 Hawai'i at 260, 921 P.2d at 734; *Vicente*, 78 Hawai'i at 251, 891 P.2d at

1043; *Dawes*, 77 Hawai'i at 121–22, 883 P.2d at 42–43, and the cases cited therein; HRS § 431:10A–105.

**28.** *Cf.* HRS §§ 431:10A–105(2)(A)(i) and (2)(C); *see supra* note 22.

**29.** *See supra* notes 22 and 28.

. . . .

Accordingly, for the reasons discussed above, the Court holds that under Delaware law, the terms of [the insured's] disability insurance policy issued by [the insurer] do not allow [the insurer] to avail itself of a defense based on the doctrine of "first manifest."

*Oglesby,* 889 F.Supp. at 773–79 (footnotes and some citations omitted) (emphases in original).

In the present case, Paul Revere is not seeking to void the policy on the ground that Doe fraudulently misstated his physical or medical condition on his disability insurance application. *See supra* section I & note 17.[30] Indeed, having opted for the statutory protections of HRS § 431:10A–105(2)(C), rather than those of HRS § 431:10A–105(2)(A)(i), Paul Revere could not lawfully do so. *See supra* notes 22, 28, and 29; *see also Oglesby,* 889 F.Supp. at 778–79. Moreover, we have held that the contractual phrase "which first manifests itself after the Date of Issue" contained within the policy's definition of a covered "Sickness," *see supra* section I, does not exclude coverage of Doe's total disability due to HIV infection, *see supra* note 3, "by name or specific description," within the meaning of the second sentence of the policy's "pre-existing conditions limitation," *see supra* section I, or paragraph 10.2.b of the policy's incontestability provision, *see id. See supra* section III.B.1. Finally, Paul Revere having issued the policy to Doe on October 22, 1985, it is uncontroverted that the two-year "contestability period" set forth in paragraph 10.2.b thereof had already lapsed when Doe became totally disabled as of October 29, 1991. *See supra* section I & note 3.

We therefore hold, pursuant to HRS chapter 431, article 10A, part I, in general, and HRS § 431:10A–105(2)(A)(ii), in particular, that the standard "incontestability clause" set forth in paragraph 10.2.b of the policy precludes Paul Revere from denying Doe's estate the "Total Disability benefit" for which Doe contracted, *see supra* section I & notes 12, 13, 14, and 15, notwithstanding that the HIV infection that caused the disability arguably "manifested" itself prior to the policy's effective date of coverage. We therefore further hold that the circuit court erred as a matter of law when it (1) granted Paul Revere's motion for summary judgment as to all claims raised in Doe's amended complaint and (2) entered final judgment in favor of Paul Revere and against Doe in accordance therewith.

## IV. CONCLUSION

For the foregoing reasons, we (1) vacate the circuit court's September 8, 1995 order granting Paul Revere's motion for summary judgment and the September 26, 1995 final judgment entered pursuant thereto and (2) remand this case for (a) the entry of an order granting partial summary judgment as to liability in favor of Doe's estate and against Paul Revere regarding Doe's first claim for relief (breach of contract) and (b) further proceedings, consistent with this opinion, regarding (i) the estate's damages in connection with the first claim for relief and (ii) all remaining issues regarding the second, third, and fifth claims for relief.

---

**30.** On the contrary, Paul Revere was quite content to continue to collect disability insurance premiums from Doe "in order to prevent [the] policy from lapsing." *See supra* section I.